Good morning, may it please the court. Your honor, with me this morning are Erwin Chemerinsky, Ben Weisner, John Ewan, and Peter Elias Berg. Very well. Your honor, the principal issue in this case... And you're Mark Rosenbaum.      Okay. It's a non-profit organization. I want to make sure you get an introduction. You're Judge Pregerson. Let me check my ID. Your honor, the principal issue in this case is whether, in the words of Chief Justice Warren and Reynolds v. Sims at 567 and 568, The basic principle of representative government that must remain unchanged, that the weight of a citizen's vote cannot be made to depend on where he lives. What Chief Justice said was at the heart of Lincoln's vision of a government of, by, and for the people. Whether that principle is to be sacrificed for purposes purely of expediency in the case of two initiatives certified by the Secretary of State to appear on the March 2004 ballot, in which, if passed, do not take effect until 2006, 2007. In one case, in 2005, in the other. And in the case of an unprecedented, unscheduled recall election, where 44% of the electorate must use a Florida-cloned punch card machine system, which the Secretary of State has decertified as defective, obsolete, or otherwise unacceptable, and which he admits in this lawsuit to be more prone to voter error than our newer systems. Those are the competing considerations in this case. Now, the difficult question in this case, as in Bush v. Gore, is one of remedy. And if the Court doesn't have specific questions on the other issues, I'd like to begin with that one. Let me start with what I think is not the difficult question of remedy, and that is the question of the two initiatives, 53 and 54, because I think those can be quickly disposed of. Neither the Secretary of State nor the interveners in this case have presented any interest whatsoever, none exist, as to why those initiatives should not be moved back to the March election, where they were originally certified to take place, or whether, in fact, at an earlier date, if one is available. Those initiatives, Your Honor, were certified more than a year ago, July 2002, by the then Secretary of State, to appear on the March 2004 ballot. For 375 days, the public was told information was sent out, campaigns were structured in a way, in deference to the representation and the certification, that that was when those two elections were, in fact, to take place. When, on July 23rd, 375 days after the certification, that election was moved, as part of what took place, all the state statutes with respect to ballot access, availability of ballot pamphlet information, all of that was changed. If you could select one example, which is laid out in detail in the MALDEF brief, just that one example, the 80 days that the citizens of this state were to have to look at the ballot pamphlet information was reduced to 37. If those initiatives pass, then with respect to Proposition 53, that will not take place, will not take effect until the year 2006-2007. And with respect to Proposition 54, that will not take effect until 2005. Just let me ask you a few questions about the initiative. There really is no question, at least in this case, that the Secretary of State had the authority to certify the election on the initiatives in conjunction with the recall election. Is that right? That's not being challenged here, Your Honor. But with respect to the- And was that issue presented to the California Supreme Court in all those cases that were litigated before- That was one of the issues that was presented to the California Supreme Court. It was summarily dismissed. It was also, in a more limited manner, part of the Section 5 challenge that was brought in the San Jose case. But I present this matter with respect to looking at the balance of interest in terms of looking at whether or not there are any interests that, in fact, would compel or that would overwhelm the federal interest with respect to equal dignity, equal weight of all votes. And my point is simply this, that an election that was certified, was scheduled to take place on March 2004, no interest presented is why that election should not, in fact, cannot, in fact, be moved in order to vindicate the constitutional, federal constitutional interest that we are presenting. One final point with respect to those initiatives and then I'll move on. And that is particularly with respect to Proposition 54. The face of that initiative, the very title of that initiative tells us that that is an initiative that is racially charged, the Ward-Connery Sponsored Initiative. And the evidence in this case, consistent with the decertification by the Secretary of State, is that the machines will produce systematic geographical disparities, but more than that, disparities with respect to voters of color and disadvantaging those voters. Let me turn to the tougher question in this case, just as in Bush v. Gore, and that's the question of the recall election itself. Your Honors, I want to deal with this as sensitively as we possibly can. What we're dealing with here is an unprecedented, unscheduled, special election as to whether a sitting governor should be recalled. Not an election as, say, with the November 2002 election, or the elections in every one of the cases which they cite. We're in uncharted territory here. Not an election where if, in fact, a delay or a postponement of the election takes place, there are federal interests that are implicated. Your Honors will recall that in the November 2002 election, if that election had been postponed, even though it took place with respect to illegal, unconstitutional punch card machines, but if that election had taken place, California would have had no representatives in Congress in violation of Article I, Section 2. All of the state's executive officers, from the governor on down, 80 members of the state assembly, 20 members of the state senate, none of those individuals would have been in position. The offices would have been vacant in violation of the Guarantee Clause of the United States Constitution, and that is, of course, what is also at the essence of the right to vote. That's why it's preservative of all other rights. Those are serious, grave federal interests, and they raise different questions that are involved here. Although, I would point out that even in the Clark and Lopez case, the United States Supreme Court indicated that under certain circumstances, even with those interests implicated, elections could be enjoined. What are the interests involved in this particular case? In this case, Your Honors, we are not dealing with a position that if the election is postponed, will be vacant. No one would be asking this court, by fiat, to fill that position. What we're dealing with in that situation is an interest that emerges out of the state constitution, Article II, Section 15, an important interest with respect to dealing with the public's concern as to whether or not this sitting governor should remain in office, and whether or not, if he is to be removed, who his successor is to be. That is an interest that calls for prompt and certain vindication, but it is not a federal interest. It is not a federal interest that competes equally with respect to the interests on this side, particularly where the substitute election, the postponement of the election, can take place in a reasonable period of time. March 4th at the latest. There's nothing in the record that says that the counties can't do it earlier. I don't know what the status is with respect to that, but that is the outside date that it can take place. What are the interests that we bring to compete with respect to that state interest? And, Your Honors, as the Court is aware, the interests that are presented with respect to the election going forward on October are all federal interests. They are all federal constitutional and statutory interests coming from the Voting Rights Act, the statutory interests are. And they are interests that are at the paramount nature of our system of constitutional democracy. That is, as Judge Wilson himself found, if this election goes forward in October, the interest of the voters is a result of the systematic, geographic, and racial disparities in the operations of the systems themselves. The injury that will be suffered by the voters of the State of California who will be disenfranchised is irreparable. It can never be replaced. This is the opportunity to vindicate those interests, or there is no other interest. He assumed irreparability. He assumed it, Your Honor, but based on what is undisputed fact. And that is, once the election takes place, because these machines have been decertified, because they were decertified out of the context of the common cause case, where the whole issue of the accuracy... De-certification is not effective until March 4th of next year. That's correct, Your Honor, and the statute... It's not fair to say that they're decertified right now. It is fair to say that they have met the standard for decertification set forward in 1922. Well, but the State has allowed them to be utilized for the last couple of elections and many local elections and whatnot. They have been used for local elections, Your Honor, is quite correct. They have been utilized for one statewide election, and that was in November 2002. The reason that that election could not be enjoined is with respect to the interest that I mentioned a few moments ago. And that is that if the election had been enjoined, and no one in good sense would have moved to enjoin that particular election, but if that election would have been enjoined, then the State would have been plunged into a constitutional crisis. Judge Ferguson said that Judge Wilson... He noted that Judge Wilson assumed irreparable injury. How did the recount process work in California? How did that fit into all of this? That's a good question, Your Honor. We've looked into the question of recount itself, and I want to make two points with respect to that. Let me first answer you directly. With respect to the nature of the errors, the problems with the punch card machines themselves, part of the difficulty with these machines, part of the constitutional invalidity, part of the reason that the Bush Court at page 104 said that these produce unfortunately results in terms of votes that are not clear, the recount procedure will not deal with the errors that the punch card machines create. It certainly can't deal with the overvote questions, and with respect to even the undervotes. Imagine, for example, the problem, and your own expert concedes this, the problem with respect to this is that it's a matter of technology, it's a matter of experience, it's a matter of socioeconomic experience and background. The problem is you push, you say, well, gee, I think I'd like to vote for McClintock, press in a little bit. No, I'm going to change that to Schwarzenegger, and then you vote there. If you undervote, you don't know as you're pressing that whether or not you've registered no votes, one vote, or two votes. That's why it's so severe, so that in the recount situation, in the recount situation when the vote is, in fact, an inspection would be made, it's going to be impervious to that sort of inspection itself. That was the problem in Florida, and that was the reason that the varying standards in Florida is for the recount. I'm not saying that that was the constitutional problem. I'm just saying that that's why it was recognized. Now, the problem in Bush v. Gore is exactly what Your Honor says with respect to the varying standards, but the cause of the problem was the punch card machines because they did not lend themselves to the sort of recount analysis you're talking about. That's point one. Point two is this, and I know the Court understands this. The rights that we're talking about, the rights of political equality, the rights that the Bush v. Gore Court talked about at page 108 in terms of having the opportunity, the same opportunity. It should not be in this country that because you're poor, because you're a voter of color, because you live in Los Angeles, that you have a less opportunity to have your vote counted. That doesn't matter whether you're voting for Schwarzenegger, Bustamante, or Gary Coleman. The point is you have that right to be counted irrespective of whether or not a recount takes place, and Your Honor is aware that very few elections may in fact deal with recounts, but the Court has upheld that principle. I understand all the declarations that have been submitted, that were submitted below. Even in these new machines that are now touch machines and other new technologies that are out there, there still is a certain error rate. There is an error rate. And I think it was in the papers it talks about like .83 or something like that. The distinction in the error rate, Your Honor, is a difference between 2.23 percent in the area of the punch card machines and .89 percent with respect to the other machines. Now, as both sides can see, you're never going to get perfection, and a certain percentage of that is just people who are obscene. But the critical point is that with respect to those numbers, and that's what's reflected in the decertification, and that's what's reflected on pages 1 and 22 of the briefs when they say, we know this is more prone to error. We know that we're trying to eliminate these machines throughout the state of California. Nobody is making money these days anywhere in the country on punch card machines. What level of statistical anomaly must exist before there's a constitutional problem? That's a question I want to answer this way, Your Honor. I think in this case we have both a qualitative and a quantitative problem. The qualitative problem is with respect to the machines themselves. That is, the state of California has set a level above which machines will be certified for use based on the standard that I talked about, below which they will be, in fact, unacceptable. What makes this case peculiar, what makes this case so stark, is that qualitatively the distinction here is between voters, 44 percent of the state's electorate, voters who will be going and using machines that qualitatively have been deemed by the state of California to be unacceptable for purpose. Quantitatively, this is what we have, Your Honor. We have the fact that the error rates that I was discussing with Judge Pius differ by a magnitude of two and a half times. All the other machines, the office... I was struck, though, that there was no statistical analysis of significance in your expert reports. Now, we ran the numbers and it appears to be statistically significant, but wouldn't that be certainly a large factor if we set aside the qualitative factors... I think... ...in assessing whether there's a constitutional problem. I think Dr. Brady did run that analysis, Your Honor, and is reinforcing the supplemental declaration. What Dr. Brady found was, in fact, that these distinctions could not be explained by any other methodology. I think he found it one in a billion chance. One in ten out of 38. Statisticians couch their findings in terms of statistical significance, which he didn't. I don't want to fight with you, but the t-test that Dr. Brady referred to at page 89, I think, of the record, I will get that exact number. But the t-test that he referred to is, in fact, a standard test for statistical significance, and he did run that. And as I indicated, that is entirely consistent with the decertification by the state in this situation. But I guess I'll ask you a question. If we're formulating a rule, at what level do we measure the anomaly or set the standard for the anomaly for there to be a difference of constitutional magnitude? I don't know where the exact line is, Your Honor. I do know that we're 40,000 votes, which are projected here, based on numbers that are not questioned, and, indeed, not a single one, there's no contrary California data that has been presented. The Secretary of State presents nothing. Essentially accepts it. The interveners who had the shot at common cause had the shot in public hearings. But that aside, there's no contrary California data. The evidence in this case is that 40,000 voters within these poor, urban, voter-disproportionate minority, those votes aren't going to be counted. It's like putting a trap door in the ballot box. That's two and a half times. Wherever that line is drawn, that is a distinction that offends the Court's principle, the Supreme Court's principle reinforced yesterday by this Court in an Idaho coalition case, in terms of equal weight and equal dignity. I know I'm not helping, Your Honor, with respect to the precise line, but I want to make clear that this is so far over the limit. And do you take anything from the reapportionment cases? I do. Can I just, when you close up that question, which is, remember that in Bush v. Gore, there were no numbers whatsoever. It was pure speculation based on the standards that Judge Paez was talking about. The lack of standards. I'm sorry, the lack of standards. That's right. Bearing a lack of standards. That's correct. But we didn't know in Florida whether or not when those varying standards applied, whether or not there was any difference. The issue at page 108 and 104 was the opportunity to have your vote counted. And the Court said, that's too extreme a chance here that it won't be. Now, the answer to that question also goes to Judge Paez's question. What Bush v. Gore did was to take 60 years of voting rights jurisprudence, even more if one goes back to Classic and Siebel, those cases, but took the Supreme Court's jurisprudence with respect to voting rights in general, hinged on the reapportionment cases, hinged on Reynolds v. Sims, because what Reynolds v. Sims talks about is the fact that under our voting rights jurisprudence, the right to vote can be impaired not just by shutting off the ballot box, not just by not counting your vote, which is implicated in this case and why this is a stronger case than the dilution cases that we're talking about, but took the core principle of representative government, what Gray v. Sanders said at 381, goes back to the 15th, 17th, 19th Amendments, the Declaration of Independence, and Lincoln's vision of this country, and said, here's the principle that has to remain undisturbed, and that is when you go to the ballot, when you go to vote, it should not make a difference what your accident of residence is. And, Your Honor, that same principle, I want to suggest to the Court, in Your Honor's opinion in Farrakhan, has filtered into the Voting Rights Act itself. In fact, we don't even ask intent questions, as Your Honor knows. And going to your point, Judge Thomas, the evidence is undisputed, the numbers are undisputed, that if you are a voter of color and you are using these machines in the six remaining counties that have not yet shifted, the chances of your vote counting will be disproportionately less, and the only reason, Judge Pius, we can even satisfy Judge Whaley's test, the by-itself test in this case, as a function of the voting box itself, the methodology that's used. The genius of Bush v. Gore, with respect to the liability, is that it imported into a voting system analysis the questions that, and the doctrine that says that there must be equal weight and equal dignity accorded to all votes whatsoever. Before you sit down, I want you to address the question of the level of scrutiny. The District Court applied a rational basis analysis, and obviously that may be a pivotal question in terms of damaging the interest. How do you deal with Burdick and the District Court's analysis? Sure. Let me say that, first of all, the District Court actually didn't apply any analysis because it didn't find, even on the facts, that there could be basis. But let me take care of both of them. First of all, as this Court reinforced yesterday in the Idaho Coalition case, strict scrutiny is to be applied when there are to be serious questions with respect to the imposition on the voting right itself. When only we look at Bush v. Gore, and I can see they didn't specifically spell out what the level of scrutiny is, but the cases relied upon in there, Harper, Reynolds, those cases are the quintessential cases that say that strict scrutiny ought to be applied. As I indicated, not only do we have vote pollution in this case, but with respect to 40,000 votes, they're going to be disenfranchised altogether. Those votes will not be counted, which is the most basic right with respect to the right to vote itself. What about the Burdick case? That is the principal case that the District Court sided and that the other case sided. That's the Hawaii write-in case, Justice White's opinion in that case. And you're honored to recall that over a three-page period in that decision, Justice White said, look, what we're dealing with here is really a First Amendment question. It's a ballot access question here. Are there alternative ways in Hawaii for the voter to be able to express what his or her preference is? You don't have to write down Donald Duck. Are there ways to get on the ballot? Are there ways, in fact, to have your preference hit? And for three pages, with respect to the primary system in Hawaii, with respect to the ballot access system, went through all the ways that that could be done. That is a far cry, Your Honor. That is a far cry from a systematic geographical and racial disparity that says to a proportion of the voters in this state, your vote, your opportunity to have your vote counted is nil. It's nil with respect to that. We don't do that in this country, Your Honor. We say that the most important principle is the principle of political equality, and we don't make those distinctions. And that's why under strict scrutiny, that's why strict scrutiny applies. One final comment I want to make. Your Honor, this system, this systematic disparity is so arbitrary. The only reason that voters will not have their votes, an opportunity to have their votes counted in the same way as the votes in the more affluent, whiter counties, the only reason is the accident of where you live. And, Your Honor, even on a rational basis test, there is no legitimate interest. This is what Chief Justice Warren said at page 567 and 568, and then I'll conclude. To the extent that a citizen's right to vote is debased, he is that much less a citizen. The fact that an individual lives here or there is not a legitimate, that's rational basis, is not a legitimate reason for over-weighting or diluting the efficacy of his vote. Either test, Your Honor, this system can't stand. I'll reserve the rest of my time. Thank you. My name is Doug Woods. I'm with the Attorney General's Office, and I'm here on behalf of Secretary of State Kevin Shelley. Everyone here agrees that courts should not enjoin elections. Plaintiffs do not dispute that proposition as a starting point. What plaintiffs argue here is that this is the rare instance in which an injunction against a scheduled election is appropriate. It's not. Judge Wilson properly found that it's not, and he properly found that it's not a proper instance for preliminary injunction based on an across-the-board analysis, element by element, of the Ninth Circuit's preliminary injunction law. Judge Wilson properly found that plaintiffs have no likelihood of success on the merits of their claims based on the race, judicata, and last year's defenses, no likelihood of success in evaluating their affirmative claims, and Judge Wilson also properly found that the balance of the hardships and the public interest in holding the scheduled election pursuant to the California Constitution overridingly supports denying the preliminary injunction. One thing that Judge Wilson didn't discuss was the specific effect on the initiatives. There isn't a requirement in the Constitution that I can find, nor a statutory requirement, that requires the initiatives to be voted upon on the October election, is there? The California Constitution, Your Honor, Article II, Section 8C, requires that the initiatives be held at the next statewide election, including special elections. Well, as I recall that constitutional provision, isn't it disjunctive? In other words, it says at the next general election or a special election? That question has been presented to the course already and has been rejected. The Secretary of State's determination that the initiatives must be held, the ballot on the initiatives must be held at the same time as the recall election as the next special statewide election has been upheld. So I take it that your position is that it's a mandatory duty on the part of the Secretary of State and not a discretionary duty? That is correct, Your Honor. The only discretion in the California Constitution is with the governor. The governor has the discretion to call a special statewide election solely for the initiatives, had he wanted to do that. Obviously, that's not the case. Well, given that as a backdrop, then what is the compelling interest of having the initiatives resolved at the special election rather than at the general election they were originally scheduled to be voted upon in March 2000? Your Honor, I'd like to address that. In contrast to the suggestion by Plaintiff's Counsel, the interest that we are advocating on behalf of the people is not in any particular speedy accomplishment of a recall election. The interest that the people have is in adherence to their own self-determined constitutional election schedule. The election schedule applies to the recall. The election schedule applies to the ballots. The integrity of the process relies upon the trust that the people have that the rules are being followed, that the rules are being followed objectively, that the rules are being followed objectively without any particular consideration of the subject of what is being voted upon. And it also requires... to that extent that the people want these propositions heard at the same time as the recall election, particularly a proposition that's racially charged. Like I say, Your Honor, I don't know... How do you back that up? Is that speculation? Our presentation on behalf of the people and the presentation of public interest isn't based on any particular poll, any particular individual's desire to have any particular initiative held at any particular time. What we are rising in defense of is process and integrity of the process. And people... In that vein, though, not to interrupt, but in that vein, how do you respond to the points made in the Moldoff brief and referred to by Mr. Rosenbaum this morning that, in fact, holding the... voting on the initiatives at the special election will violate other provisions of the election code, particularly those that call for adequate notice and opportunity to view the statements concerning the ballot initiatives? Those were questions of state law that the courts... that the courts have considered and they have rejected the challenges based on the general proposition that the California Constitution controls over the election code, the California election code. I understand it as a matter of state law, but in balancing the interest here, and that's what you're asking us to do, is to hold that the state constitutional interest is paramount over federal interest, how do you think the state election laws fit into that calculus? That presents a great point that I need to address in order to disavow the court of what plaintiffs have been saying so far. They would characterize this case as a battle between the California Constitution, on the one hand, and the federal Constitution, Equal Protection Clause and Voting Rights Act, on the other hand. That's not what we have here, and that's not what is presented to this court for decision. I haven't heard that argument. Pardon? I haven't heard that argument today. That's the spirit of what they're saying, and I think that's what Judge Thomas is picking up on as a response to what the plaintiffs are saying. The failure, the flaw in plaintiff's analysis is that California constitutional provisions in which the people have an interest are a necessary part of the federal analysis. They're a necessary part of the federal preliminary injunction analysis. My question was specifically given your statement, what role does the process that the state of California has mandated for the holding of elections have in that calculus? I gather your answer is it's irrelevant that the process to which you speak is irrelevant given the Constitution, California Constitution. Is that what you're saying? I'm saying that the process that has been selected in advance, mutually without favoritism toward one side or another, is what the people have an interest in. Yes, I'm talking about the state statute now. We're talking about the election statutes that you, as I previously said, were trumped by the California Constitution. And my question is, what role does our consideration of securing the value of those processes have in our consideration of the balancing of interests in this case? Is your answer that it has no interest? No, Your Honor, my answer is that the California election law, embodied by the California Constitution and the election code, is the expression of California's self-determination, political self-determination. Now, to the extent that internally there is some conflict between accomplishing an election on schedule, pursuant to the California Constitution, and sending out voter pamphlets, etc., some of the mechanics set forth in the election code, to the extent that there is some conflict, as a matter of California law, the California Constitution must take precedence. So, in other words, assuming the lieutenant governor has had the election a week from the certification, meaning that no information would go out at all, your answer would be that still the interest in the California Constitution trumped any other interest of California election law. I think that would have been a difficult question for the California Supreme Court. They may have considered setting an election that quickly and not allowing for the election processes required by the election code to occur, to prevent an abuse of discretion, given that he had an opportunity to set the election in 80 days. Fortunately, that's not what we have here, Your Honor. And the challenges that have been brought, court after court, have declined to stop the election and have affirmed the processes that are in place. Well, are there other provisions in the California Constitution that would trump the provision that you've been talking about? There are no provisions in the California Constitution that would provide for the recall election and the initiatives that are now set to be voted upon at the same time as the recall election. The California Constitution protects the civil rights and civil liberties of the people of this state. They're rather broad, aren't they? Yes, Your Honor. And some have said they're broader than the protections accorded by the Bill of Rights in the federal Constitution. Yes, Your Honor. And that maybe takes me to a discussion of Judge Wilson's order. The judgment of Judge Wilson, plaintiffs are unlikely to exceed on the merits of their claims based on the race to recall. This recall election, had the certification taken, oh, what, about a month and a half later, would then have been held at the same time, the recall election would have been held at the same time as the March general election. That's correct, Your Honor. If circumstances had been different from what they are now, then... Well, it's that happenstance of, what, 90 days that's made the difference? Your Honor, but happenstance is circumstance. That is what happened. And the Constitution doesn't allow for discretion to make allowances for what might have happened otherwise. The election process that has been established by the California Constitution requires that this election take place no later than October 7th. You want to talk about race judicata, so I want to give you the opportunity. One of the problems I have with the district court's analysis on race judicata is the question of privity. Obviously, the NAACP was not a party in Common Cause 1. Why do you think that the doctrine of virtual representation ought to apply to them? I think the easy way of looking at the privity question is that the number of interest groups, public interest groups that were plaintiffs in Common Cause, and the breadth of their mission, and the breadth of their desire to serve the people of California and protect the voting rights of the people of California, in particular people of color, I think the interest of California voters were being advanced by the plaintiffs in Common Cause. There was an identity of interest between the NAACP, what the NAACP is presenting now. Isn't it a different question now because of the scheduling of the initiatives on the special election ballot? In other words, when a consent decree was entered into in Common Cause 1, the Secretary of State had already scheduled the initiatives for vote in 2002, by which time the pre-scored punch card systems would no longer be in existence. But now, prior to this suit, the Secretary of State changed the date of the election, which would give rise to different interests. Why isn't that a different interest that a different plaintiff could secure? Let me put it this way. Why should a plaintiff be prevented, given that new development, a new plaintiff who was sworn to the first cause of action, why should that plaintiff be prevented from pursuing an action based on race judicata? Your Honor, there's no identity of interest problem presented there. The interest that the NAACP might have today in not having the initiatives and the recall take place on October 7th on the punch card machines is the same interest that was being advanced by the Common Cause plaintiffs in the prior action. They didn't want punch cards. They felt the punch cards were hurting their members' interests, and they wanted the punch cards out. So they secured a consent decree that basically indicated that those initiatives wouldn't be voted on until the machines were replaced. Now there's a different action by the Secretary of State. Why should a plaintiff, as a matter of policy, be prevented from challenging the new developments? The plaintiffs then and the plaintiffs in Privy now were bound. It was an unanticipated development. It was unanticipated in the sense that nobody knew exactly what the particulars of future elections between May 2002 and March 2004 would be. But everybody knew that there was a recall provision. Everybody knew that there are provisions in the California Constitution that set the schedules for initiatives. And everybody knew, presumably, that such a provision had never been used before. I disagree, Your Honor. Say what? Say what? Well, actually, Your Honor, there actually have been numerous efforts to recall governors statewide dating back 30 years. None have gone so far as this one. But it is not an unprecedented act and certainly not a hidden provision in the Constitution by any stretch. The plaintiffs in Common Cause were bound to what was existing in the law at that time and exists today. And those in Privy, those with an identity of interest, were also bound. Look at it this way, Your Honor. You have a different injury, though. Let's take a complex example. Let's say that you have a suit against an automobile manufacturer for a product defect brought by a plaintiff in California. Consent decree entered in that case. Normally, we would never consider another plaintiff to be bound by the prior consent decree. And here you have a consent decree. Of course, it's a much larger issue statewide. And even though the plaintiffs in this case may have some common interest, there is a different injury that is asserted in this lawsuit by the NAACP, it seems to me. Your Honor, the only way it can be considered a different injury is if you characterize the claim so narrowly as to only be specific to a particular election at a particular time and a particular circumstance. If the claims in Common Cause were, we want to decertify punch card voting systems. We want to do it, in fact, by March 2002. That was their claim. If they had pursued that claim and succeeded in that claim, we wouldn't be here today because the recall election would be held on some system other than a punch card voting machine. But they pursued that claim. Ultimately, they settled for a March 2004 decertification date. And that was the consent decree. That was their claim. We want to decertify. And the claim by the NAACP segregated is we want to enjoin this election. Yeah. But that's too narrow a definition, Your Honor. What they're saying is we want to decertify the machines not only for March 2004, but we want to decertify the machines for this election. Okay. That's an interesting point. And that, I think, is an important distinction because that, I think, that tells the tale of the claims being the same. Essentially, what plaintiffs are asking for in seeking to escape the application of the consent decree, they're asking for, if you take their arguments at face value, what they're basically saying is once the consent decree was signed, California's recall provisions were eliminated from the Constitution for two years. That, obviously, was not our intent in entering into the consent decree. That, obviously, was not Judge Wilson's intent when he signed the consent decree. And I'm expecting... Well, how do you know that? I gather, I think it's a fair inference from his order that he considered that the consent decree would do exactly what it said, and that is bar use of the voting systems in California as of March 2004. He didn't say at the time that consent decree was signed that this is, this consent decree is not going to apply to any intervening statewide recall election. Nobody thought about it. Your Honor, we all took the law... You thought about it at that time?  I did not. I did not. We took the law as we found it. Consider if the shoe was on the other foot, Your Honor. March 2004... Say there's no recall election. I take the law as it's found in the Equal Protection Clause as well. Consider whether, what we would do if the shoe were on the other foot. If there were no October 7th recall election, we proceeded apace by March 2004. The punch card counties have transitioned to other equipment. March 2004 elections occur. August 2004, all of a sudden, recall effort, petitions gathered, recall election certified, and indeed there's going to be a recall election. The Lieutenant Governor schedules the election for 80 days out, and all of a sudden, Secretary of State says, wait, hold on. When I agreed that we would decertify by March 2004 and change voting systems on March 2004, I never contemplated that there would be a recall election. I never contemplated there would be a recall election after March 2004. You know what, I think... That's not a very persuasive argument. Well, maybe in that particular circumstance, all the reasons... At that time, all of the counties would have had this new equipment. Your Honor, and that plays into my point exactly, Your Honor. The race judicata prejudice and the laches prejudice is that everybody has been working towards a March 2004 transition. Everyone, the counties, the Secretary of State staff, has been doing their ordinary work and making this global transition from a punch card system to something else from March 2004. If they had thought that there's some chance that we're going to have to hold an election earlier than March 2004, and we can't hold it on a punch card machine, you know what, they would have taken some steps to do something differently so that the October 7th recall and initial election could be held. It's too late. It's too late in the game to switch a rule on the common college consent decree. The prejudice is too severe. I don't want you to leave the podium without having an opportunity to discuss the level of scrutiny applied. The district court relied on verdict, which really doesn't say that rational basis applies in this instance. It more or less talks about a sliding scale. And every other case seems to indicate strict scrutiny. Bush v. Gore doesn't say strict scrutiny, but I think it's a fair inference that they imply strict scrutiny. What's your position on the level of scrutiny that ought to be applied in this case and describe your basis for it? The first point, Your Honor, is that Judge Wilson ordered that regardless of the level of scrutiny, the public interest in holding a scheduled election was compelling, and the October 7th election on the punch card voting machine was narrowly tailored to accomplish that compelling interest. So for the initial matter, you don't think we even need to go? That's correct, Your Honor. And Judge Wilson didn't need to. If we do, what's your position? I do have an opinion. I think that the verdict decision was clear in setting forth a two-tiered analysis. A severe restriction on the right to vote will merit strict scrutiny. A reasonable, non-discriminatory election process, regulation of the election process, will be considered, will pass constitutional muster as long as it is reasonably related to accomplishing the election. That's the standard in verdict. Bush v. Gore didn't change that standard. And I gather your position in this case is that even though the Secretary of State has found, as a matter of fact, that these voting systems are absolutely not acceptable, that that does not present a difficulty in the sense of a discriminatory system. That's correct, Your Honor. Explain to me why. Well, I think the discriminatory that the verdict decision referred to is not one that is talking about effect. Otherwise, if they were, then the Mobile v. Bolden case would be out the window. And what that case was about was that you cannot state an equal protection claim based on voting rights, based on race, unless you show that there is intent to discriminate based on race. And so I don't think the verdict reference to non-discriminatory was a lightly used word pointed toward a machine that may or may not have a discriminatory effect. I think what they were pointing at was the intentional poll tax, literacy test, the things that the court has recognized in the past as severe restrictions on the right to vote. The State ticket concedes that about 40,000 people in the counties that still use that punch card system would be deprived of their votes. Not at all, Your Honor. Not at all. And that's another fallacy in Plaintiff's presentation. Plaintiff's presentation of the merits fails just as a matter of proof. We agree with their past numbers on what residual votes have been, undervotes and overvotes. It's a matter of public record. We fundamentally disagree on their analysis and what those undervotes and overvotes mean in terms of a so-called error rate. And we also fundamentally disagree that there's any basis for taking past results and speculating as to what impact they may have or what carryover there may be to the October 7th election. The Secretary of State is taking extraordinary efforts to educate the voters on the use of all of the voting machines and in particular the punch card voting machines. And it's our expectation and our hope that indeed residual vote numbers will be lowered. Any place at the precinct level or just in public announcements? Local precinct level. Election specialists actually go into the polling places. And there are all sorts of media, electronic, TV, radio, print, the ballot pamphlets. What kind of information does the voter get when the voter walks into the booth? About the voting system and how to utilize the punch card system. There are instructions on the booth. There are instructions in their voter pamphlet if they brought that with them. But there are instructions about where to place the ballot, how to punch the card. All the instructions there. That's correct, Your Honor. This is over 50 years that punch card voting has been used or close to, I guess, 40 years. And do you have any study that educates that education remedies the problems inherent in punch card voting? I mean, it's not in the proof in this case. It's just your assertion that education will overcome. It's our assertion that educational effort is the proper response to fears that residual votes will continue to be high. Rather than canceling an election, better to try to remedy the problem. I understand your point, but my question was a little more specific. I haven't seen any evidence that indicates, at least in the evidence you presented in the district court, and maybe I missed it, that would indicate that education overcomes the inherent problems with the pre-scored punch card system. The pre-scored punch card system has mechanical difficulties. It has problems in the voters. Unlike other systems, the voters can't examine their ballots for accuracy before they turn it in. And it has a number of problems that you can't design out, at least in the systems that are in use. So I guess we have to accept your assertion and hope. Is that what you're saying? I disagree, but I understand your point, and I will address it. I don't know of any particular study that has systematically gone through and said voter education has such and such effect. I don't know that such a study would be feasible. I will say this. You do an education program and you measure the results compared to prior elections. I'm speaking of the political science difficulties of controlling for that factor. I will say this, though. Plaintiffs make a big point of saying that within counties, there is a, within an individual county, there is a disparity between the residual vote counts for minority voters and residual vote counts for non-minority voters. I'm hoping that plaintiffs are suggesting that there is something intrinsic about minority voters that makes them incapable of accomplishing their vote effectively. I'm hoping that their point is these people need a little more education for whatever reason, whatever their background is, they need a little more education, a little more instruction, and that's part of the reason that the Secretary of State is engaging in these extraordinary education efforts. Well, you know, a lot of these folks get up early in the morning, go to work, and they're probably in a hurry to get to the job at night. They've been working hard all day and they want to get in and out. And then if you have an added burden, they've got to start looking for a new polling place. And isn't that right? Aren't the number of polling places being reduced? You know, I don't know what the latest is. I know that there was some plan to consolidate polling places. I don't know ultimately what the conclusion is. I read a paper that about, I don't know, 70, well, maybe at least 60 percent of them, maybe, well, maybe more than that, maybe 75 percent, one in four. You'd have one polling place that would take care of other elections that consolidate four polling places. You know, them people, they're in a hurry and they go back to the old school and they find out, well, where am I supposed to vote, and there's a sign, they've got to look up where the place is. And then they get tired and they go home. They've been working all day. That claim was raised in the governor's lawsuit and the Supreme Court rejected it. A lot of minority people are working all day. Minority and non-minority people. It's the same issue for everybody. I mean, in L.A., if you look around, I don't see who's working and who isn't working. My recollection of the allegations was that the additional distance would be something on the order of a half a mile. I don't I don't know that that is the basis for joining an election. I thought about that. You know, you take a mother who's got three or four kids and she's got to get to the polling place and, you know, thought it was right at school and now it's a half mile away. These are all valid considerations. And have a chauffeur and have a car. What's she supposed to do? These are all valid considerations, and these are the issues that the county registrars and to some extent the Secretary of State's election staff wrestle with throughout the year, every year, every election. I'm glad to know that. There isn't there isn't anything that plans have presented to suggest that the phenomenon of the polling places. Complicated factor. I mean, the problem is my own experience. When they move the polling place, I don't know where to go. You know, I call up my wife and say, where do we vote? It's a complication. One hundred thirty five people on the ballot is another complication of this election. But I think that what I really want your answer to is in terms of education. I mean, there are certain parts of this problem you can't educate or design around, which is that chads can be hanging. They can be pressed back in. They can votes cannot be counted. These are these are anomalies that aren't present in other certified voting systems. Couple points. You're on one hundred thirty five candidates. That that's that's a known issue. What we've got is one punch card ballot, one punch card ballot actually has three hundred twelve spaces to accommodate ordinary elections. With a lot of with a lot of issues, a lot of decisions. We've got one hundred thirty five candidates from which the voter can choose one. We've got one question. Have you designed a system so they cannot choose more than one on the ballot? The the only system that's available to do that really is touch me system. And that is what I mean. That's the point of the study. They're only supposed to pick one. That's one of the problems with the pre-scored punch system is that they actually can select more than one and they can try to select one. So I didn't mean to vote for X. I'm going to vote for Y and accidentally dislodge one and have their vote. I mean, these are mechanical problems. My point about about the the number of candidates is that there is no great number of choices that need to be made. That that adds to the confusion. There are four four choices. What in terms of mechanics, the California has recount provision. There are provisions for voters, officials, courts. This isn't a situation like Florida where they and actually plans expert will acknowledge this. If you look at page nine of the supplemental declaration of Professor Brady, he says, look, acknowledge California's election administrators are much better than Florida's. In addition to the talent and sophistication of the election administrators. We have established we can't proceed. We can't procedures. Methodical step by step procedure. I think my point was that the mechanical problems of this particular system are such that a compression within the vote tabulation machine itself can actually alter the balance. In other words, you've got Chad that gets pushed back into place or that gets knocked out accidentally. Those those errors cannot be cured by recount. I think any evidence on that on that front is speculative. I think it's in the early Salton studies of 1975, 1988. I mean, this is not this is a known problem. This technology. Is that true that in the California punch ballot, you can vote for everybody on the ballot. They all get counted. They don't get counted. No, that would be an overvote. And it would be everybody, you know, I voted for you. And that, you know, actually, we make light of it for your honor. But that actually is something that people intentionally do. Maybe not for that reason, but people actually do vote for multiple candidates, knowing full well that their ballot will be disqualified. And that's another reason that the residual vote count that we're talking about is at best a crude proxy for a true error count. Well, no, but you get back down in the differences. You can see whether there are other other factors apply because you would expect there. The differences on intentional voting would remain relatively constant across demographic and geographic areas. Wouldn't you? That's an interesting issue. Also, if you look at Professor Brady's discussion and he responds to what the interviewers put together and attempts to explain why it is. He comes to the conclusion that the punch cards are causing residual votes. When I took statistics, you know, right after they taught me about the marbles in the box and all that kind of stuff. The next the next point they made was you cannot equate correlation with causation. Well, sure. But I mean, you can you can then find if there's statistical significance in the correlation by using regression analysis. You are. But there may be an entirely different. There may be an entirely different phenomenon that is at work that is common to the counties, common to the people in these counties. But the nationwide studies have essentially confirmed that. So and there may be a factor, a factor, a phenomenon that is common to those guys. The basic point I'm making is we cannot assume that because there's correlation, there's causation. You can't assume it. You surely can't assume that is going to continue in the future. And you surely I take your point that I know your time is running out. But let me ask you this. If all that is true, then why did the secretary of state decertify these systems as unacceptable and obsolete technology? Thank you for making sure that you're careful with your life. That's exactly what the secretary of state did. He decertified the pollster of automatic punch card systems because they're absolutely antiquated and antiquated and otherwise unacceptable. He never said that they are defective. They said they were flawed. Never said they were unconstitutional. Never said that they represented a Voting Rights Act violation. They're unacceptable for use in California. That's right. For Californians, they're not good enough. That's what he said. For Californians, that's that's right. They're unacceptable. That's what you say. They're unacceptable for continued use. He recognized as the crowd as the common cause players recognize and as Judge Wilson recognized that there has to be a transition period in which these these systems not preferred. Not what we want to use, but the ones that we have, we've got to be able to use them while we accomplish our elections that are required by the Constitution in the meantime. Judge Wilson didn't abuse his discretion, Your Honor. We we ask that you affirm his order. And I have one request. If notwithstanding our argument, the court is inclined to consider reversing Judge Wilson's decision. We would ask that this court stay the enforcement of his order while we seek relief from the Supreme Court. Thank you. May I please support Charles Diamond on behalf of Ted Costa, who is the intervener in this case with me as Mr. Robert Schwartz, Victor G., Robert Welch and Charles Bell. Mr. Woods was good enough to cede me 10 minutes of his time so that I could address the constitutional issues. And I noticed he's used quite a bit of it. I trust I still can impose upon his largesse. There is a lot of things to cover. And, Judge Thomas, I want to come back to the question of whether punch card voting compared to the alternatives is everything that it's cracked up to be as bad as the plaintiffs would have you believe. Because I think the evidence in this case, the record in this case, does not support that proposition at all. What you're being called upon to do in this case is to judge the constitutionality of the voting system, which, as you pointed out, we have used for nearly half a century. We've used it to elect every statewide officer currently holding office and, I believe, every statewide officer who has held office for the past 40 years. The plaintiffs in this case could... We have had problems that have come up from time to time with hanging chads and all the rest of it. I'm not going to dispute that there are not imperfections in this voting system, Judge Ferguson. But the day we retired hand ballots and hand manual count ballots and introduced machines on which we register our choices and machines to tabulate those choices, we injected into the system some degree of imperfection. We have too many people to do it the way they could do it up in Humboldt or Shasta. We can't do that in San Bernardino, San Diego, Los Angeles, and Riverside counties. We need a modern, mechanized system to do it, and if you introduce machines, you introduce some degree of error. But it's our view that the constitution is sufficiently elastic to permit election officials to respond to local needs, to make prudent choices, to make judgments about what's acceptable, to balance considerations, and to conclude that punch cards are an acceptable alternative. Secretary Shelley and his predecessor may well have run for cover on this issue, but virtually every voter registrar in this state is solidly behind punch card technology. They're being carried into different technologies not because there are neat interfalls, but because they have confidence in the system. Can mistakes occur? I don't dispute that mistakes can occur, and I'm going to address at the end of this argument whether in fact the residual rate is a mistake in the first place. Because I think there's very, very untenable evidence to support that proposition. But yes, mistakes can be made. The question is whether this is unconstitutional. But beyond that, what the planners are asking you to do is not declare punch card voting unconstitutional. They're asking you to call off all California elections, to stop elections from happening, simply because perhaps we can do it better. Well, we always can do it better. And in fact, there are technologies that are not going to be available in March of 2004 that can do it better. Are we going to be back here in February and joining the March election? Because the planners can come up with evidence in the October election. Touch screens did better than central count optical scan, and there's a disparity. And we all know that touch screens are only being used in the most wealthy counties. The question in this case really is one of the superiority of technology alone. The question is whether or not the differences in technology are so stark based on geographic area that it amounts to a dilution of vote. I mean, I think you can see that if a county used and endorsed a system that counted no votes or only the votes of a certain race, shall we say, that would not be constitutional. So there has to be at some level in looking at differences in voting machines or technologies or the way that it's administered. I fully agree with that. But let's stop and ask, what did we hear? You pressed my colleague, Mr. Rosenbaum, on the question here, equal one man, one vote. Does that really mean one man, one vote? Because that's his position. Any variation between one man, one vote, and you have a constitutional violation. Now, I submit to you, I mean, if that's the case, then we don't have a constitutional officer sitting in Sacramento who is elected with a constitutional system. We've never conducted a constitutional election. We never will conduct a constitutional election. There are going to be disparities so long as one county can use a different machine than another county. Well, the United States Supreme Court has told us that one county can use a different machine than another county, that there can be disparities. If we know anything about the one man, one vote principle, it's that it has some elasticity to it. It does not require mathematical precision. The question is how much elasticity. And what's your theory on that? What constitutional principle would you have us articulate? That any system is okay? I wouldn't go as far as that, but I don't think you have to. There's no new law here. We're operating in an area where the precedents are quite clear. You know, Sims tells us that mathematical equality is not what the Constitution requires. And we have decades of Supreme Court precedent, all reaffirmed in Bush and Gore, attesting to the fact that when you're dealing with weighing one voter's vote more or less than a neighbor's vote, there can be some play in the joints. And, in fact, what do we learn from the reapportionment cases? That 10% play in the joints is not only constitutional. It's de minimis. Courts don't even look at it. You don't even roll up your sleeves until you start talking 15, 20% disparity between one county and the neighboring county. Now, that is a reapportionment case, but think about it. It's the same thing. It's a neighbor's vote counting less, weighing less, than somebody in an adjacent county. And if there's a 10% disparity in populations, you're essentially saying one man, one vote in one county, but one man, statisticians tell me, .91% of a vote next door. And the Supreme Court has uniformly said no constitutional violation. I don't think I can stand up here and, in good conscience, give you a percentage and say, if the variation is more than X, you have a violation, because the Supreme Court has told us that the Constitution doesn't provide any unthinking litmus tests like that. You have to look at context. But what I can tell you, and I can tell you with absolute certainty, that the variation in this case does not raise a constitutional problem. We see it in the briefs, and we heard in the argument in the district court, and to some extent this morning, that this case is all about Bush and Gore. Let's stop and think. What did the Bush court actually do? You remember that Florida was very much like California. Punch cards were used in metropolitan counties in Florida. In some of the outliers, they used hand tabulation votes. They used, I don't think they had optical screens in 2000. They did use, I'm sorry, touch screens. They did use optical scanning devices in various counties. And there was a disparity in the residual rate, and a disparity that the Florida Supreme Court wanted to address with a recount. Now, what does Bush stand for? It says, if you're going to do that, that's fine. You have to do it pursuant to reasonable, thoughtful standards that are going to be of uniform application. Florida didn't have it. The court was up against the deadline, and it said, we're going to have to go with what we have. What did we have? If you look at the numbers, which are in Justice Stevens' decision, punch card residual rate 3.92 percent. Optical scan residual rate 1.43 percent, a difference of 2.5 percent. We elected the President of the United States and accepting, without question, a variation of 2.5 percent. In this case, the residual disparity. And bear in mind, this is only one election, one set of data for California. And I think it's not representative of all the data. But the best that Dr. Brady can come up with is 1.3. Now, I ask you, how can a 1.3 variation be unconstitutional, to be violative of one man, one vote, when 2.5 got our President elected and blessed by seven justices of the United States Supreme Court? There were six. Seven as I count them. I'm happy to go over each of the decisions with you. How they voted, you know. They were all counted, though. That's a good question. I don't know how they take the vote in the Supreme Court. I never made it that high as a law clerk. But, you know, some other things come out of Bush v. Gore, which I think are very, very instructive. And this Court has said you can't believe the rhetoric of the Pecurian decision or some of the separate opinions. You really do have to dive down a little bit closer than 30,000 feet and start looking at what the justices said about this issue. We do know for a fact that Verdict says that local officials need to have flexibility, and that we're not going to apply, we're not going to hamstring them with rigidity and rigid interpretations of the Equal Protection Clause. But, and it's against the backdrop of Supreme Court decisions which say, which stand for the proposition that mathematical certainty is not required and that we look at each situation individually and that local officials have a fair amount of discretion. The Pecurian decision made it quite clear that it didn't intend to disturb that. The Pecurian decision says the question before the Court is not whether local entities in the exercise of their expertise may develop different systems for implementing elections. It recognized that local officials, local county officials in California, it's not done on a statewide basis, it's done on a county-wide basis, have that right even if it injects disparities. And if you look at some of the other decisions, Justice Stevens wrote, joined by Justices Breyer and Ginsburg, he was talking about one man, one vote, and he said the interpretation of constitutional principles must not be too literal. We must remember that machinery of government would not work if it were not allowed a little play in the joints. And then he said, if it were otherwise, Florida's decision to leave each county the determination of what balloting system to employ, despite enormous differences in accuracy, might run afoul of the equal protection clause, clearly saying that the disparities in the Florida system did not. What did Justice Souter say, joined by Justices Stevens, Breyer, and Ginsburg? It is true that equal protection does not forbid the use of a variety of voting mechanisms within a jurisdiction, even though different mechanisms will have different levels of effectiveness in recording voters' intentions. Local variety can be justified by concerns about cost, the potential value of innovation, and so on. And we all know what Justice Rehnquist, with Justices Scalia and Thomas, thought about the argument that the variations resulting from punch cards raised equal protection claims. He scoffed at that, saying that the state had no obligation to prevent voters from making mistakes, and that hanging chads were the responsibility of voters because the rules and regulations of the election clearly told voters to go make sure you turn in a clean ballot, and that's what we do in California. So, I don't think we need to figure out exactly where on the ruler the percentage deviation needs to be. On the record, in this case, the plaintiffs haven't come close. I'd like to respond to your question, Judge Thomas, on the level of scrutiny, because, again, I don't think we're asked to deal with this question with a blank slate. There is a substantial amount of Supreme Court precedent on the question. And I think the verdict was properly cited by the district court, and, in fact, in the hearing in front of Judge Wilson, cited as sort of a showstopper that Mr. Rosenbaum had real difficulty dealing with, because it says what we're dealing with is a sliding scale. I mean, if you're dealing with very significant burdens on the right to vote, if you're dealing with burdens which are purposeful, like the one the panel of this court dealt with yesterday, and obviously on their face discriminatory in that they're intended to favor one group as against another, then you have a proportionally higher burden of justification if you're the state official kind of trying to justify what you're doing. But by the same token, verdict said that if we're dealing with simply the incidental results of otherwise reasonable benign choices by state officials, then the scrutiny level is far less. And any kind of normal regulatory interest the state may have in conducting its elections is generally sufficient, even if it creates some disparity in the weight that's accorded to any single ballot. You place a lot of emphasis and just went through your understanding of Bush v. Gore. Why don't we just apply the level of scrutiny that they applied there, where they said having once granted the right to vote on equal terms, the state may not, by later arbitrary and disparate treatment, value one person's vote over that of another? You know, I could trade verdict quotes with you. Why don't we just go with what the Supreme Court said in Bush v. Gore? Well, Bush v. Gore at the tagline level can be cited for virtually any proposition. But how can you pull a line out of Bush v. Gore and say a disparity of 1.37 percent in the possibility that a vote won't be counted is unconstitutional when the decision that you're citing approved a disparity of 2.5 percent? Now, we're talking about the level of scrutiny, though, and Bush, although I don't read Bush v. Gore as mandating strict scrutiny. It certainly relied on cases that applied strict scrutiny and implied a strict scrutiny review. Verdict talks about a sliding scale, and the district court appeared to use rational basis. So verdict doesn't compel the use of rational basis. So it is an issue in this case, and it may well be explicit. Well, I agree with Mr. Woods. I mean, I think a fair reading of what Judge Wilson did was to say, look, under any standard, I come out the same way. And that's what district judges get paid to do, to exercise those kinds of judgments. And only if there's been a clear error in making that judgment is he subject to being reversed. He had a lot of things to weigh. And I think he applied what he thought was an appropriate standard. But he said, if I apply strict scrutiny, it doesn't make any difference. I come out the same way on this case. Whatever it is. Whatever it is. Does your client have a position on the initiatives? In other words, if there is a difference in analysis on the initiatives versus the recall petition, does your client have an opinion one way or the other on postponement of the initiatives? You know, I specifically haven't addressed that subject with my client, but I will tell you what our view on that subject is, Judge Thomas. You don't get there unless you find a constitutional or statutory violation in this case. Because we don't just push off to another day elections, which the election code says we hold today. And I see no basis whatsoever to enjoin the election process in California until March of 2004 on the basis of punch cards. So I don't see any basis to do that. And we see the election code and the California Constitution, to some extent, joining at the hip the date. I'll tell you what would worry me if I was a judge. It's an all or nothing proposition. Well, you know, my client does not have an interest in the outcome of those elections. He is the proponent of the recall initiative. I am standing here speaking on his behalf. So does he have a position? No. But what I would be very concerned about if I was a judge sitting up there and not just a paid lawyer or an unpaid lawyer, as the case may be, standing down here. I seriously avoided using my firm name when I came to the podium. I wanted to put another chair up. I would accept that invitation. Do I get a vote? And how do I vote? What I'd be concerned about, and I think it applies in spades to the recall ballot. You know, we establish timetables in the absence of the heat of battle. We promulgate rules, the rule of law, in a neutral setting. Right, but the problem with the initiatives, of course, is that the timetables established by the election code cannot be observed if the election is held. In other words, and I realize your client is not interested in that, but there is a real conflict in the initiative in terms of dealing with these initiatives between the set processes, the neutral processes not concocted in the heat of battle that must predate the consideration initiative and what's happening in this case. And that is a real conflict. You know, like any lawyer, I have an opinion about anything, and I probably ought not to stick my nose into this dispute because it ain't mine. But I'll tell you my view on that. There may well be a state law issue to be decided. That state law issue was, in fact, posited to the California Supreme Court in connection with Governor Davis' petition mandate proceedings. And we appeared in that case, and we opposed that mandate petition. But he raised that issue as well. I don't see that it raises a federal question. It's not obvious to me that it does because I don't think that every instance of a state not following its own rules presents a due process violation. And, in fact, we had that litigation in the district court in the central district in connection with another piece of recall litigation. If it does, it hasn't been pleaded, and it hasn't been raised, and I don't see that a court of appeals ought to be reaching out to adjudicate issues, claims, constitutional claims that have never been raised at all, including that raised in the court below. I don't think that's the argument here, though. The question is how you treat those issues in terms of a calculation of public interest and balance of hardships in trying to respect the state processes. But you don't have a dog in that fight, so I don't want to take more of your time on that. I can address the Voting Rights Act claim briefly, but there's an expert sitting on the bench who wrote one of the two leading decisions in the Ninth Circuit. And I think it's sufficient to say that there was an utter failure of proof in the court below to make out a Section 2 claim. If we learn anything from Salt River and Farrakhan, it's that simply statistical evidence that minorities do worse than non-minorities because of some particular practice doesn't get you there. Salt River was exactly that case. You don't own land in Arizona, you don't get to vote in the election. You could see statistically that minorities voted less frequently in those water district elections than non-minorities. And the question was, is that a violation? Clearly, it's disparate impact. Same thing here. Same analog here. And what the Salt River court said, Judge Fletcher, was that doesn't make out a Section 2 claim. You have to show it is on account of race and not some independent factors. And beyond that, you have to show that it infects the minority's ability to actively participate in the political process. And there was a failure of proof in Salt River. This case is exactly the same. I mean, all we have is that punch cards do worse than other systems. Punch cards are used in large metropolitan counties. More minorities live in metropolitan counties. Hence, there's a disparate impact. Minorities have a greater risk of losing their vote than a white voter in Orange County, perhaps. Although, I think Orange County is using punch cards. There is no evidence, and there was no evidence submitted below. And the plaintiff was quite boastful about saying, we don't need to connect up and show that the disparate impact is on account of race. Well, on its face, it's not on account of race. It's on account of where people tend to live in California. And as Judge Paez wrote in the Paragon decision, absent some evidence connecting the dots, that there's some racial discrimination, racial history, some context, some circumstances to show that that's the result of discrimination. You haven't proved that the practice causes a prohibited result on account of race. And that's all we have here. The only other study we have is Mr. Brady's, Dr. Brady's correlations, which supposedly show, and I find these to be, the conclusions he draws from them to be very unsettling, particularly for these plaintiffs to make. But he says, the heavier the concentration of minority within a county using punch cards, of minorities, the greater the likelihood of punch card error. And I join Mr. Woods in hoping that the plaintiffs aren't saying that's because their view is that minorities somehow can't work a punch card machine. I don't think they're saying that. But if they're not saying that, then there's got to be some other factors at work. Education levels, voting experience, any number of things. But their Section 2 claim would fail on that ground, because there's nothing connecting up the dots. You only have a prohibited discriminatory result if the disparity results on account of race and not some other factor, as Judge Fletcher wrote in Salt River, as Judge Paez observed in Farrakhan. And there was absolutely no evidence below suggesting that those statistical correlations were on account of race. And in fact, our experts said, you can come up with myriad of confounding variables which would explain that. And he did. And he didn't have the burden of proving, disproving it wasn't on account of race. They had the burden of proving it was on account of race. And they didn't offer any evidence whatsoever. Do you want to bring it to a close? Only if you don't want to hear me talk about why punch card technology is... I'd love to hear you talk. Why don't you just record it and send me a tape? Your Honor, I think I've done one better. I've written it down, and I've put it in a red-colored brief that I'd ask you to take a look at when I sit down. We've read it. A lot of effort went into that, and I think it says it probably better than I could say it. But if I can just close on the constitutional question. The court below identified a number of very important public concerns at issue in this case. This is an unprecedented situation. I don't disagree with Mr. Rosenbaum on that. This is one of the biggest political hot potatoes that we've encountered, at least in my recent experiences in California. It seems to me, it seems to me that the state has a very, very compelling interest, and the people of California have a very compelling interest to see this election go off on schedule. I think the one thing that all Californians could agree on is that we don't want to have to endure this situation for another five months beyond the schedule of election day. And I think California, as a political entity, has a great interest in making sure that the election comes off on schedule. California, as I think everybody knows, is facing very grave, unprecedentedly grave problems in Sacramento, and I think that the people of California are entitled to a governor, be it Governor Davis or be it somebody else, who is paying full-time attention to the problems of the people of California and not to his own problems. I think in fairness to Governor Davis or any sitting governor, the state has a compelling interest to get these issues resolved. If this is a lunatic fringe that started this, and it really doesn't represent the views of a majority of Californians, I think the sitting governor has a right to have the question decided very, very quickly and have everything put to rest. And I think the framers of the California Constitution, Governor Johnson, who authored the recall provisions in 1911, were very wise to write in the Constitution that this election must take place. Not that it should or it can't, it must take place within 60 to 80 days. That was a wise choice. I think the state has a compelling interest in seeing that decision, its Constitution, respected in that regard, and given the absence of any basis to call a halt to all California elections because perhaps we could do it better, I think this court should affirm the district court. Thank you. I just want to make four brief points. First, Judge Ferguson, you asked questions regarding the reduction in polling places, and I want to provide the information. It's in Professor Hasson's brief. I'm informed that in Los Angeles County, the number of polling places that normally would operate 5,000 is going to be reduced to about 1,800. And you're exactly right, Judge Thomas. This is a case about changed circumstances. Your Honor, since 1923, there have been, in the county of Los Angeles, city of Los Angeles, three days in which it has snowed. That's more times than there have been recall elections in the state of California, and it's certainly more times that we've had to deal with the reduction in polls, about with 135 names, a system whereby it is likely, it is certainly not remote, that the margin of victory will be less than the margin of error. And contrary to what was said, in fact, the evidence is undisputed in the record below, and I want to specifically direct the Court's attention to page 188 of the record, Dr. Brady's declaration, that voter education will not get the job done. If, in fact, voter education was the answer here, then the question is, why wasn't it done before, and why do we go through this decertification? I'm a little concerned about some of the comments that the Secretary of State has made today. The context in which this decertification took place, and this was the first time in the state's history that a voting system has been decertified pursuant to precisely the standard under 19222 that your Honor, all of your Honors have discussed here, first time it's ever happened, that took place in a common cause case one day before we were scheduled to take the deposition of the official, Mr. Mott Smith, in that office, who was charged with dealing with accuracy and reliability. Even today, and I believe this has the stature of a legal admission, the state writes the very first lines of its brief, punch card voting systems are old technology more prone to voter error than are newer voting systems. Both the present and the prior Secretary of State have been acutely aware of this reality and have taken aggressive steps to eliminate the use of punch card machines statewide. It's not a question of getting the newest model that's out there because it's shinier. It's a question, as you said, Judge Fragerson, of whether or not we should accept the unacceptable. Secondly, I want to deal with the question of the level of scrutiny that is required in this situation. Your Honor, as the Court said, that verdict did not say rational basis should be applied. It said it should be a sliding scale. This is what the Court specifically said. Under the standard, the rigorousness of our inquiry into the propriety of state election law depends upon the extent to which the challenge regulation burdens First and Fourteenth Amendment rights. There is no doubt, reading from page 434 of Justice White's opinion, there is no doubt that the Hawaii election laws, like all election regulations, have an impact on the right to vote, but it can hardly be said that the laws at issue here unconstitutionally limit access to the ballot by party or independent candidates or unreasonably interfere with the rights of voters to associate and have candidates of their choice placed on the ballot. And then, as I indicated earlier, there are three pages of all the openings that were available. That's a far cry from this case. This is not just a vote solution case, Your Honor. This case challenges. And I want to emphasize this point. Nobody, after March 4th, there aren't going to be punch card machines in California. You can get a good, you can get an old punch card machine cheap in California after March 4th. No local entity is saying we want them for any particular purposes. They're out. But the problem in this case, the precise challenge in this case, is to the fact that it's occurring at a very narrow crack in time in which three of the nine counties that were under the consent decree said, have made the changes, typically the more affluent counties, and the remaining counties, 56%, as opposed to 42% minority, have not done that. That's the precise issue that's involved here. But Your Honors are correct that what is required here is a sensitive scrutiny. And what is involved here, as I said, is not just a solution. It's just not, well, their votes are only worth one-tenth what the votes are somewhere else. Let's say with the case in Reynolds, or the reapportionment case that Judge Pye was referring to. The problem here is that for 40,000 voters, imagine, imagine if the state said tomorrow, this county with 40,000 votes, we're not counting your votes. And then add to it that it's disproportionately minority. That's it. This is the cleanest possible case of vote denial. Now, as I said, it would be like cutting a hole, putting a sieve in the ballot box, because those votes themselves are not going to be counted. And I wondered, as I listened to these arguments, what meaning, what meaning do they attach to Bush v. Gore? They don't take a position, well, it's just a one-day episode. Okay. But until the Supreme Court specifically tells us that, based on the jurisprudence that relies upon, that's not the law. The law is precisely that this is a case involving equal weight and equal dignity to vote, and that call for strict scrutiny. Don't these machines make a difference? Or is this just a tiny difference? My gosh. Look at page 177 of Dr. Brady's chart. All the other machinery is virtually the same, .89. It's only the machinery that they've decertified as illegal, as you said, Judge Pregerson, and it's unacceptable that it's two and a half times. That's the problem in this case. The problem in this case is the difference. Third, the state law case that was raised, there was not a decision on the merits. The Supreme Court simply dismissed the particular petition, and Your Honor is exactly right. If anything, not only is there some dispute about the construction that was accorded with respect to the initiative election, but under the state equal protection clause, under cases like Serrano, income is, in fact, a suspect classification. So, if anything, the equal protection clause under the state constitution affords more protection. That's where I'm good about this argument. How can it be, say, that Section 5, the Supreme Court has twice told us that elections can be enjoined, but that couldn't be done under the equal protection clause? That couldn't be done under Section 2? Let me talk about the Voting Rights Act point that was made. The evidence was undisputed. It was absolutely undisputed that there was a difference. 4% with respect to minorities, 1.3% with respect to whites. Now, how was that done? How did Dr. Brady do it? All the objections they raised were objections as to method, which, in fact, as his supplemental declaration demonstrated, he had, in fact, anticipated. What Dr. Brady did, among other things, was to look at 100% minority census tracts and compare them to 0% census tracts. And he found the difference of almost three times. What does that mean? It means if you have an ATM, a whites-only ATM that mirrored this system, the white would go up to that ATM, take out $100, and be charged 50 cents. The person of color would go up to the other ATM machine and take out $100 and be charged $2. That's the nature of the disparities that exist in this case, and they are exactly wrong when they say that the court's cases don't reflect that. It may be true even in the Reynolds situation, and I think we actually have a stronger case than Reynolds, but in the Reynolds situation, that some disparity exists. But under the 14th Amendment, under the 15th Amendment, cases like O'Million, and under the Voting Rights Act, that sort of distinction, that sort of disparity, is not tolerated. Let me say one more thing about the racial dichotomy question that you asked Judge Thomas, and then I'll stop. Your Honor is correct. NAACP was not in privy with this case. The racial dichotomy is even more important than that, on two levels. The distinction, the idiosyncratic, and the problematic differences in this election that I have outlined, taken within the context of the fact that this is a special election inserted into time. I don't know that I fully answered your question before. Imagine that we had a situation where we said, well, you have two years to desegregate the schools. And imagine that somewhere within that period of time, the school system says, well, we're going to open up an all-white school. We move into and join. We say, that's a different claim. And indeed, the claim that we're bringing here under Article III could not have even been brought. Could not have even been brought at the time. How can it be that a claim that was not right during the entire pendency of the litigation, one day after a special election that nobody anticipated, that was different in character, all of a sudden gets barred because of race judicata in Washington? But if the all-white school was to be open, could they say, well, gotcha, you missed it? And that brings me to my final point. Let me just say this about the race judicata. I didn't re-judge Wilson's opinion or his order as resolving definitively the question of race judicata. He said it was an obstacle. He gave it his best assessment applying our case law. Absolutely. And that's all he said. Absolutely. And, you know, you take it for what it's worth. Absolutely. Absolutely correct. But I want to conclude by considering the policy implications of the argument they're making. This is what happened, Your Honor. First, the machines were decertified. As I said, the Secretary of State decertified those machines, first time in the state's history, a day before we were supposed to take that deposition. Then the court said, the district court said, in October of 2001, while Governor Davis was still in office, said there's one remaining question. This is at pages 1111 and 1112 of 213 F. Stuff Second. He said there's one question remaining, and that's the feasibility. The Secretary of State, and Mr. Woods was representing the Secretary of State, and Mr. Woods is an honorable man, and Mr. Woods said, look, 2006 is when this is going to be decertified. Then it got moved to July 1, 2005. So, as Judge Wilson said at that point, the difference is whether or not you affect the general election or the primary in March 2004, or whether or not it was his situation in 2005. We litigated that question. The court found that it was plainly feasible to do it in March 2004. The impact of their argument, why it is so non-common sensical, and frankly why it is so offensive to the process, is that we were operating in good faith with the Secretary of State. The Secretary of State told us during this period of time, this is going to be expensive. This is going to take labor. Should we have said, Judge Wilson, we're not really asking for March 2004, which was the only statewide election besides the November one, which was not feasible to have machines. Should we have said, well, we think it should be October 2003. Why, Mr. Rosenbaum, should it be 2003? Well, Governor Davis might get re-elected. Then in February 2003, there might be a decision to recall him, and then there might be a special election, and then the initiatives might be moved from March 2004 to 2003, and the Secretary says, well, that's going to cost us a lot of money, and that's nowhere on the horizon. We don't even know him. That's the policy that they're arguing in this particular case, and it is precisely why res judicata should not apply, because the federal rules of civil procedure should not be game of wordsmanship where the claims themselves have not actually been litigated, so to handcuff us in order that we can say, well, an unconstitutional election where individuals are not going to have the right to vote, where the votes are not going to be counted, that that can go forward. I have nothing further on this. Well, thank you, and the arguments were very good on both sides by the intervener, and we appreciate those arguments, and we appreciate your case, and we'll take the matter into submission, and the court will now reset until called. All rise.
judges: Pregerson, Thomas, Paez